UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

BRISTOL ELDER SERVICES, INC.,   )
                                   )
          Plaintiff,        )
   v.                        )        CIVIL ACTION
                                   )        NO. 11-10900-JGD
LINDLEY ACQUISITION CORP.,    )
                                   )
        Defendant.      )

## MEMORANDUM OF DECISION AND ORDER
## ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

March 29, 2012

DEIN, U.S.M.J.

## I.  INTRODUCTION

This action involves the interpretation of the termination clause of a Contract
pursuant to which the defendant, Lindley Acquisition Corp. ("Lindley"), provides food
services to the plaintiff, Bristol Elder Services, Inc. ("Bristol"), for the elderly population
that Bristol services in Southeastern Massachusetts.[1]  The Contract was signed in
September 2010, and covers the period of October 1, 2010 to September 30, 2011.  On or
about March 1, 2011, Bristol sent a letter to Lindley purporting to terminate the Contract
with 60 days notice, supposedly in accordance with the "Termination Without Cause"
provision of the Contract, which allows either party to terminate the Contract by
providing written notice to the other "at least sixty (60) calendar days before **its effective**

---

[1]  A copy of the Contract is attached to the complaint as Exhibit 1.

**date**." (Emphasis added). Bristol contends that "its effective date" relates to the effective date of the termination notice. However, Lindley refused to accept the termination, contending that "its effective date" relates to the effective date of the Contract, and that the Termination Without Cause provision only allowed a party to terminate the Contract 60 days prior to the inception of the Contract. Bristol thereafter commenced an action for a declaratory judgment in Bristol Superior Court, which was timely removed to this court by Lindley.

This matter is presently before the court on cross-motions for summary judgment. Bristol is seeking a declaration that it is entitled to terminate the Contract without cause as long as it provides Lindley with at least sixty days written notice prior to the date of termination. (Docket No. 10). Lindley, in turn, is seeking a declaration that termination without cause is only permissible if written notice is given sixty days prior to the effective date of the Contract. (Docket No. 14). Both parties contend that the language of the Contract is clear and unambiguous or, in the alternative, that even if the language is ambiguous, their interpretation is the only logical one.

Lindley's proposed interpretation renders the termination without cause provision a nullity in its own Contract since the Contract was signed less than 60 days before the effective date of the Contract. Moreover, Lindley's interpretation also is inconsistent with the "Timetable and Basis for Contract Award" provision, which expressly requires that contracts be awarded less than 60 days before October 1st. That provision provides in relevant part that "[due] to the existence of potential contract termination provisions

that may adversely affect the delivery of meals to elders, **no caterer contract shall be awarded to a winning bidder prior to sixty (60) calendar days before October 1st, the beginning of the Federal Fiscal Year**." Contract at p. 2 (emphasis added). Lindley's proposed interpretation would render the termination without cause provision a nullity for all contracts with an effective date of October 1 since parties would only be able to terminate their contract without cause either before or simultaneously with the award of the Contract. That interpretation makes no sense and cannot be controlling. For this and the other reasons detailed herein, Bristol's motion for summary judgment is ALLOWED, and Lindley's motion for summary judgment is DENIED. A declaration shall enter which provides that the Termination Without Cause provision shall be interpreted to mean that "[e]ither party may terminate the Contract without cause upon provision of written notice to the other at least sixty (60) calendar days before the effective date of the notice of termination."

## II.  STATEMENT OF FACTS

Unless otherwise indicated, the material facts of this case are not in dispute.

### The Award of the Contract to Lindley

Bristol is a private non-profit corporation located in Fall River, Massachusetts. Complaint ("Compl.") ¶ 1, Counterclaim ("CC") ¶ 1. Bristol operates a Nutrition Program designed to provide nutritionally sound meals to elders in its service area. Contract at Specifications, p. 2. To accomplish this, Bristol contracts with a caterer

which is to provide the meals.  To obtain a caterer, Bristol engages in a bidding process.

Contract at Specific Information, p. 2.  The Executive Office of Elder Affairs of the

Commonwealth of Massachusetts has the right to review and comment on all bids

received.  Id.  Lindley participated in the bidding process and was the successful bidder.

CC ¶ 8.  Lindley is a commercial caterer who has been in business for more than 30 years

and has provided services to Massachusetts non-profits similar to Bristol for more than 10

years.  CC ¶ 6.

Bristol obtained "an industry standard contract for Massachusetts" from the

Executive Office of Elder Affairs and then edited it to conform to its program.  CC ¶ 9.

The Contract was signed by Bristol (referred to as the "project") on September 14, 2010

and by Lindley (referred to as the "provider" or "caterer") on September 23, 2010.  It is a

three year contract, although rates are set annually and defined in an attached "Provider

Agreement."[2]  See Contract at p. 3, ¶ 8; Provider Agreement at p. 1; Def. Mem. (Docket

No. 15) at 2.  Thus, the "Contract Duration" recited in the Provider Agreement was from

October 1, 2010 to September 30, 2011.

The Contract contains a provision relating to the "Timetable and Basis for

Contract Award."  Contract at p. 2.  That provision recites the following:

> Due to the existence of potential contract termination provisions that
> may adversely affect the delivery of meals to elders, **no caterer**

---

[2]  The Provider Agreement is an attachment to the standard form contract and incor-
porates the contract.  The Provider Agreement is found at the beginning of Exhibit 1 to the
complaint.

4

> **contract shall be awarded to a winning bidder prior to sixty (60) calendar days before October 1st, the beginning of the Federal Fiscal Year**.  Unless a more specific provision is set forth herein, any contract entered into between a Nutrition Project and a Caterer shall be consistent with and subject to the Commonwealth Terms and Conditions for Contracts.

Id. (emphasis added).  The signing of the Bristol/Lindley contract in September 2010, therefore, was consistent with the requirement that the contract not be awarded earlier than August 1, 2010.

The Contract itself imposes no specific obligations on the caterer between the date of the contract award and the effective date of the contract.  Rather, the contract language implies a likelihood that the Contract would be awarded to experienced caterers.  For example, the Contract requires bidders to "include evidence of ability and qualifications to deliver bulk hot, prepackaged chilled and/or weekend frozen meals in adequate quantity on a regular basis[,]" including evidence of "prior and/or existing similar contracts" and financial information.  Contract at Specific Information, p. 2.  Once the contract is awarded, the caterer is to obtain a $100,000.00 performance bond "[w]ithin thirty (30) days of the effective date of the contract[.]"  Contract at Performance Bond, p. 2.  Although Lindley contends that this performance bond is to be obtained before the effective date of the Contract, see Def. Mem. at 9, there is no such requirement.  Rather, it is clear from the language used that the performance bond must be obtained within 30 days after the Contract is effective, i.e., by November 1, 2010.  Pursuant to the terms of the Contract, Bristol was supposed to provide Lindley with menus one month in advance.

Contract at Menu Submission, p.18.  Presumably that requirement was waived at the outset since the Contract was signed less than a month before its effective date.

In the instant case, the parties began to perform under the Contract on October 1, 2010.  CC ¶ 18.  Lindley delivered approximately 2000 meals each weekday to Bristol's several locations.[3]  CC ¶ 19.  As noted above, Bristol sent Lindley a notice terminating the Contract without cause on March 1, 2011.  Lindley challenged Bristol's right to terminate at that time.

## Termination Provisions

There is an entire section of the Contract entitled "Contract Duration and Termination," which addresses a number of scenarios relating to the possible termination of the Contract.  Contract at p. 3.  With the exception of the provision at issue in the instant case, to the extent that a contract termination provision requires written notice, that notice expressly must be given within a specific time prior to the "termination date."  There is no indication that anything different was contemplated by the "termination without cause provision" at issue here.

The "Contract Duration and Termination" section starts off with the provision that the Contract "shall not be canceled by either party for the first thirty (30) days" and, after that, it can be terminated with cause and proper notice.  Id.  As this provision states:

---

[3]  Despite the termination notice, the court has been informed that the parties continue to operate under the Contract.  Presumably, then, Lindley is continuing to provide meals, although the court has no information about the current operation.

> Subject to federal and/or state regulations, the contract shall not be canceled by either party for the first thirty (30) days, and may be canceled after that time by either party, **with material cause**, at the end of the calendar month by **a notice in writing not less than thirty (30) days prior to the termination**.

Contract at p. 3, ¶ 1 (emphasis added).  Thereafter, the Contract provides that Bristol can terminate the Contract immediately if there is non-compliance by Lindley which "endangers the life, health, and safety of any recipients of services under this Agreement[.]"  Id. at ¶ 2.  For other conduct which constitutes non-compliance with the contract provisions, Bristol must give Lindley the opportunity to "restore compliance," absent which Bristol "may terminate this Agreement by furnishing the Provider with written notice at least thirty (30) days prior to the effective date of termination."  Id. at ¶ 3.  Similarly, if Bristol "fails to comply with a material provision of this Agreement[,]" Lindley may terminate the Agreement (without a cure period) "with written notice of termination at least thirty (30) days prior to the effective date of termination."  Id. at ¶ 4.

The next paragraph provides that "[u]pon termination, with at least forty five (45) days notice," Lindley is entitled to compensation if it submits invoices "not later than sixty (60) days after the date of termination."  Id. at ¶ 5.  If Lindley terminates the Agreement with either less than 45 days notice or with no notice, Bristol can retain certain funds as a penalty.  Id. at ¶ 6.  The previously referenced performance bond was also intended to compensate Bristol in the event Lindley terminated the Agreement "for any reason, other than the project's substantial failure to comply with the agreement with

7

at least forty five (45) days advance written notice given[.]"  <u>Contract</u> at Performance

Bond, p. 2.

Following all these provisions about termination for cause, there is a separate

paragraph, which is at issue here, that provides as follows:

> Termination Without Cause.  Either party may terminate the
> Contract without cause upon provision of written notice to the other
> at least sixty (60) calendar days before its effective date.  Whether or
> not cause to terminate exists under any other provision, a party may
> elect to terminate without cause.

<u>Contract</u> at p. 3, ¶ 7.  Finally, the next paragraph provides:

> The term of this contract is for a period of three years.  It is renew-
> able with the agreement of both parties for two additional one-year
> periods.  **There must be adequate provision, however, for
> cancellation of the contract in the absence of an appropriation of
> adequate federal funds or for other material cause**.  The area
> agency and/or the nutrition project must inform the Department of
> the details of the annual or other period contract amendments or
> modifications that occur during the life of the contract prior to the
> approval of these changes by the area agency.

<u>Id.</u> ¶ 8 (emphasis added).  Thus, there is a recognition that things may change during the

life of the contract.

Additional facts will be provided below where appropriate.

# III.  ANALYSIS

## A.   Standard of Review

The First Circuit, in the recent case of <u>Farmers Ins. Exchange v. RNK, Inc.</u>, 632

F.3d 777 (1st Cir. 2011), has reviewed the principles applicable to interpreting disputed

contract terms.  As the court explained:

> "[U]nder Massachusetts law, interpretation of a contract is ordinarily
> a question of law for the court, and, as a question of law, is subject
> to plenary review."  *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d 420,
> 424 (1st Cir. 1998) (internal quotation marks and citation omitted).
> A court interpreting a contract must first assess whether the contract
> is ambiguous.  *See Bank v. Thermo Elemental Inc.*, 451 Mass. 638,
> 888 N.E.2d 897, 907 (2008).  "To answer the ambiguity question,
> the court must first examine the language of the contract by itself,
> independent of extrinsic evidence concerning the drafting history or
> the intention of the parties."  *Id.*  "Ambiguity is not created merely
> because the litigants disagree about the meaning of a contract."
> *Nicolaci v. Anapol*, 387 F.3d 21, 26 (1st Cir. 2004).  Rather, "a con-
> tract is only ambiguous where an agreement's terms are inconsistent
> on their face or where the phraseology can support reasonable differ-
> ences of opinion as to the meaning of the words employed and
> obligations undertaken."  *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d
> at 424 (internal quotation marks and citation omitted).
>
> The meaning of an unambiguous contract term is a question of law,
> while the meaning of an ambiguous contract term is a question of
> fact.  *Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 761 N.E.2d 946,
> 951 (2002); *see also Fairfield 274-278 Clarendon Trust v. Dwek*,
> 970 F.2d 990, 993 (1st Cir. 1992).  "Should the court find the
> contract language unambiguous, we interpret it according to its plain
> terms."  *Den Norske Bank AS*, 75 F.3d at 52.  Summary judgment is
> appropriate when those plain terms unambiguously favor either side.
> *Bank v. Int'l Bus. Machs. Corp.*, 145 F.3d at 424.  "On the other
> hand, if the contract's terms are ambiguous, contract meaning
> normally becomes a matter for the factfinder, and summary
> judgment is appropriate only if the extrinsic evidence presented
> about the parties' intended meaning is so one-sided that no

> reasonable person could decide to the contrary." *Id.* (internal
> quotation marks and citations omitted).  In the absence of fraud or
> mistake, "an agreement is presumed to express the intent of the
> parties." *Fairfield 274-278 Clarendon Trust*, 970 F.2d at 993 (citing
> *Hess Oil & Chem. Corp. v. Ristuccia*, 3 Mass. App. Ct. 772, 331
> N.E.2d 823, 823 (1975)).

Farmers, 632 F.3d at 783-84.

Applying these principles to the instant case, this court concludes that "the plain language of the contract, interpreted to ascertain the manifest intent of the parties and to effectuate their purposes," compels the conclusion that notice must be given at least sixty (60) calendar days before the effective date of the termination notice.  See id. at 783. While this court reaches this result on the basis that the contract is not ambiguous, even if the contract language was found to be ambiguous, this case falls into the category of cases where "despite the ambiguity, no reasonable person could interpret the contract as one party does," so summary judgment is appropriate.  Nadherny v. Roseland Prop. Co., Inc., 390 F.3d 44, 48-49 (1st Cir. 2004).

**B.    Analysis of the Contract**

Neither of the parties argues that the phrase "its effective date" should be read in isolation, and neither has urged upon the court any rule of grammatical construction which should apply in interpreting whether "its" applies to the Contract or the written notice.[4]  Consequently, the court will follow the well-recognized directive that it should

---

[4]  There is a "general rule of grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation."  Deerskin Trading Post, Inc. v. Spencer Press, Inc., 398 Mass.

"consider the contract as a whole.  Its meaning cannot be delineated by isolating words and interpreting them as though they stood alone.  Not only must due weight be accorded to the immediate context, but no part of the contract is to be disregarded."  <u>Farmers</u>, 632 F.3d at 785 (internal quotations and citations omitted).  Reading the Contract as a whole, this court finds "that the contract is not ambiguous – only [Bristol] has advanced a plausible reading of the disputed provision."  <u>Nat'l Tax Inst. Inc.</u>, 388 F.3d at 18.

As an initial matter, Lindley's proposed interpretation renders the termination without cause provision meaningless in its own Contract, since the Contract was signed less than 60 days before its effective date.  This runs counter to a basic requirement of contract interpretation that "no part of the contract is to be disregarded."  <u>Farmers</u>, 632 F.3d at 785 (quotation and citation omitted).  Moreover, in the instant case, the terms of the Contract expressly prohibit the awarding of a contract "to a winning bidder prior to sixty (60) calendar days before October 1st, the beginning of the Federal Fiscal Year."  <u>Contract</u> at Timetable and Basis for Contract Award, p. 2.  Under Lindley's proposed interpretation, the termination without cause would have no meaning for all the contracts executed within this 60 day window, since in those cases a party would have to give notice of its intent to terminate the contract without cause either before or on the date the

---

118, 123, 495 N.E.2d 303, 307 (1986) (quotation omitted), <u>cited</u> in <u>Nat'l Tax Inst. Inc. v. Topnotch at Stowe Resort & Spa</u>, 388 F.3d 15, 18 (1st Cir. 2004).  Assuming a similar rule applied in the instant case, "its effective date" would modify the last antecedent term – in this case the written notice.  However, no party has argued for the application of this canon of grammatical construction.

contract was awarded.[5]  Thus, Lindley's proposed interpretation is inconsistent with this "Timetable" section and runs counter to the well-recognized principle that "[c]ommon sense is as much a part of contract interpretation as is the dictionary or the arsenal of canons." Fishman v. LaSalle Nat'l Bank, 247 F.3d 300, 302 (1st Cir. 2001).  Since "[t]he presumption in commercial contracts is that the parties were trying to accomplish something rational[,]" id., Lindley's interpretation must fail.

It is also significant that the "termination without cause" paragraph follows a number of other paragraphs in the section entitled "Contract Duration and Termination." Contract at p. 3.  "Often, related provisions may cast light on meaning." Nat'l Tax Inst., Inc., 388 F.3d at 18.  In the earlier paragraphs, the contract language made it clear that written notice had to be given a specified number of days before the effective date of the notice.  There is no indication in the Contract that the writers intended a dramatically different interpretation in a different paragraph in the same section of the Contract. While admittedly the use of the same language would have been preferable, if the parties had intended a drastic change, the shift should have been made clearer.  "[S]crutinizing the contract language for the parties' intent" leads to the conclusion that the Contract could be terminated without cause upon the giving of 60 days notice.  See GTE Wireless,

_____

[5]  Although there is no evidence in the record as to how many contracts are effective as of October 1 and that answer is not necessary to this court's contract interpretation, given the express reference in the contract to October 1 and the critical importance of state and/or federal funding for the performance of the contract, this court would expect that an October 1 starting date would not be uncommon.

<u>Inc. v. Cellexis Int'l, Inc.</u>, 341 F.3d 1, 4 (1st Cir. 2003) (court begins its analysis of ambiguous contract term by trying to ascertain parties' intent from the language of the contract).

Lindley argues that interpreting the Contract as being terminable without cause with 60 days notice is inconsistent with the rest of the Contract and unworkable.  These arguments, however, are not persuasive.  Thus, Lindley argues first that allowing a termination without cause would "eradicate all provisions of the Contract requiring termination for material cause[.]"  <u>Def. Mem.</u> at 6.  However, there can be no question that the parties to the Contract recognized that there can be situations where the Contract can be terminated without cause.  Not only is the paragraph in question labelled "Termination Without Cause," but it states that "[w]hether or not cause to terminate exists under any other provision, a party may elect to terminate without cause."  <u>Contract</u> at p. 3, ¶ 7.  Apparently the drafters of the Contract felt that 60 days notice was sufficient for the terminated party to recover from the termination.  Clauses which allow terminations without cause are not unusual, and are enforceable.  <u>See</u>, <u>e.g.</u>, <u>The Binkley Co. v. Eastern Tank, Inc.</u>, 831 F.2d 333, 335-36 (1st Cir. 1987) (court grants summary judgment enforcing termination without cause provision allowing buyer to cancel contract).

Lindley also argues that a 60 day termination notice "is entirely inconsistent with the provision that neither party may terminate the Contract within the first 30 days."  <u>Def. Mem.</u> at 6.  First of all, this paragraph provides that the Contract "shall not be canceled

by either party for the first thirty (30) days" and does not appear to prohibit the sending of a 60-day notice of termination within that initial period.  <u>Contract</u> at p. 3, ¶ 1.  If the 60-day notice was sent on the first day of the Contract, the contract would be in full force and effect during the initial 30 day period.  Moreover, even if this provision were read to prohibit the sending of a notice in the first 30 days, it would not preclude the sending of a 60-day notice on the 31st day.  There is no inconsistency between these two provisions.

Lindley next argues that its interpretation – giving the parties "the ability to terminate a contract prior to its effective date" – is necessary to insure that the parties can terminate the agreement if funding is not received.  <u>Def. Mem.</u> at 7.  However, that contingency is addressed elsewhere in the Contract.  First, as discussed above, the Contract is not to be awarded until close to the beginning of the Federal Fiscal Year, thereby giving the parties assurance that there will be funding.  In addition, the Contract provides that the failure to obtain funding always is grounds to terminate the contract. <u>See</u> <u>Contract</u> at p. 3, ¶ 8 (although Contract is for 3 years, and renewable twice for 1 year periods, "[t]here must be adequate provision, however, for cancellation of the contract in the absence of an appropriation for adequate federal funds or for other material cause."). Contrary to Lindley's argument, being able to terminate the Contract before it starts is not necessary to insure that the Contract can be terminated if there is insufficient funding available.

Lindley's next argument is really the crux of its complaint.  It argues that to allow a termination without cause during the term of the Contract "would discourage Providers

from bidding this type of contract for fear that they could expend tens of thousands of dollars in preparation and never receive any benefit (payment for services rendered under the contract), because the Project decides, without cause, to abandon one Provider for another." Def. Mem. at 7.  It may very well be that this contract clause is a disincentive for entities to bid on the contract, but this concern does not make the clause ambiguous or unenforceable.  There can be no question that the Contract allows for a termination without cause.  Even if this were to happen between the time the Contract was signed and before the Contract started, it would not guarantee that the parties had not yet expended funds and devoted resources to fulfilling the Contract, which would be lost if the Contract were terminated.

Finally, the record before this court does not substantiate Lindley's contention that a great deal had to be done in preparation for the Contract so that the parties must have intended that it could not be canceled other than at least 60 days before the Contract started.  Lindley argues that it "made a substantial commitment of money and resources, procuring the performance bond, entering into a lease, rehabbing a kitchen facility, purchasing vehicles and equipment, and hiring and training employees.  Bristol also made a substantial commitment of money and resources, acquiring and training staff and volunteers for the programs, preparing menus and facilities and submitting the information to Lindley." Def. Mem. at 9.  While all this may be true, in fact the Contract was signed only one week before it went into effect.  Consequently, Lindley must have had much of the necessary equipment and personnel in order to be able to begin performing in only

15

one week's time.  Moreover, the Contract itself appears to contemplate that experienced and operational providers would bid for the Contract.

A termination without cause provision in any contract may cause hardship to a party.  The drafters of the agreement before the court, however, appear to have determined that 60 days of lead time before the Contract ended was sufficient to address the parties' concerns.  Lindley's interpretation would render the termination without cause provision a nullity.  The interpretation put forth by Bristol is the only logical interpretation.

## IV.  ORDER

For all the reasons detailed herein, Bristol's motion for summary judgment (Docket No. 10) is ALLOWED, and Lindley's motion for summary judgment (Docket No. 14) is DENIED.  A declaration shall enter which provides that the Termination Without Cause provision shall be interpreted to mean that "[e]ither party may terminate the Contract without cause upon provision of written notice to the other at least sixty (60) calendar days before the effective date of the notice of termination."

          / s / Judith Gail Dein
          Judith Gail Dein
          United States Magistrate Judge

16